By the Court.—Freedman, J.
—The action, as brought, is based on the theory that the defendant Shaw, by collusion with different parties, placed the plaintiffs in a situation of embarrassment for his own advantage, and that, after having succeeded in this, he availed himself of the opportunity to deprive the plaintiffs of their property. These matters, if established by competent proof, would constitute a fraud against which a court of equity could afford relief, for false statements of matters of fact are not necessary. But- the evidence falls short of making out such a case.
For three years prior to October, 1869, the defendant, Shaw, assisted the plaintiff, De Lavalette, as but few prudent business men would have done.
In December, 1866, he leased to her the Reunion Hotel, and sold her the furniture therein at the sum of *15 $28,500, without receiving one dollar in money. He contented himself with taking a chattel mortgage of $23,500 upon the furniture thus sold, which is conceded to have been worth the price asked, and another chattel mortgage of $5,000 upon the furniture and fixtures she then had in the De Laneau House, and which, together with her leasehold interest in the premises, were then already incumbered by a prior mortgage of $3,000.
When the holder of the last-named mortgage pressed for payment, Shaw, at the solicitation of De Lavalette, in February, 1867, advanced the amount, and took an assignment of it.
During the next twelve months, he advanced her the further sum of $7,382.85, to secure which he took (1) her bond secured by a mortgage on two lots in the rear of the De Laneau House, which had been bought by her for $17,000, and on which a purchase money mortgage of $14,000 then still rested, and (2) a mortgage on her leasehold interest in the De Laneau House, which was already incumbered as above stated.
In May, 1869, when, on the ground that De Lavalette had assigned her lease to Clarissa Knight, and transferred to her the title to the furniture in the De Laneau House, the owners of the fee refused to renew the lease of said house, except on condition that Shaw should become surety for the rent, Shaw, at the solicitation of De Lavalette, did become such surety for the plaintiffs for the term of five years, then ensuing. Shortly thereafter, the plaintiffs allowed several months’ rent to accumulate and to remain unpaid, which default induced the owners of the fee to commence proceedings for the recovery of the possession of the premises. These proceedings had been prosecuted to a termination, and the owners of the fee had obtained judgment for the possession, when, in October, 1869, De Lavalette again applied to Shaw for a *16 further loan, with which to pay the rent then in arrear and exceeding the sum of $2,000.
There is nothing in the evidence tending to show that, up to this time, Shaw had not been as good a friend to the plaintiffs as they could desire to have for business purposes, but now he refused to loan any more. Hq declined to extend any further assistance to the plaintiffs. He offered, however, to loan the money to Mr. Childs, with whom De Lavalette was negotiating about a sale of an interest in the De Laneau hotel-business, provided he, Childs, would take an assignment of the lease, and complete his negotiation with De Lavalette, but Childs declined.
Shaw then said that if plaintiffs chose to assign the' lease to Chandler, he would lend him the money, but he would not do so, unless plaintiffs made an unconditional assignment to him, and this plaintiffs consented to do and did do. There can hardly be a doubt that Shaw intended that the assignment should be absolute not only in form, but in fact, and that the plaintiffs so understood it, for they had the assistance of counsel in this transaction and acted upon his advice. Notwithstanding such assignment they could have hope, but to be dispossessed would have been immediate ruin. Perhaps they supposed that thereafter they would find it comparatively just as easy to get along with Shaw as it had been in the past. But whatever their motives may have been, it is sufficient, for the purposes of this appeal, that there is no evidence tending to show that Shaw, by unfair means, induced them to do so.
But even if it be deemed that the assignment of the lease to Chandler was intended as a security merely, and that thereby Chandler, or the defendant Shaw, supposing Chandler to represent Shaw, became vested with no other or higher title than that of a mortgagee in possession, plaintiffs are in no better position, be *17 cause, by virtue of the subsequent purchase of the plaintiff’s leasehold interest at the foreclosure sale, Shaw became the absolute owner, irrespective of the assignment and by a paramount title, and thereafter had a perfect right to make such terms with plaintiffs or with third persons desirous of purchasing, as were satisfactory to him.
What followed the assignment to Chandler is fully set forth in the findings of the referee, and these in turn are fully supported by the evidence. True, eventually the plaintiffs lost everything they had, but such loss was the result of lawful proceedings and the direct and natural consequence of their inability to meet their engagements, and not the consequence of any wrongful act on the part of Shaw or any of his co-defendants, and the evidence shows pretty plainly, even outside of the oral statements of witnesses, that such inability to meet their engagements arose from the fact that ever since 1866 De Lavalette had been doing a losing business. The testimony also shows that after the assignment to Chandler, Shaw for some time continued to give to plaintiffs, as he had done before, his assistance in a number of negotiations set on foot by De Lavalette for the purpose of effecting a sale of an interest in the hotel business of the De Laneau House, or Ashburton House as it was then called, and that after. plaintiffs had even lost all legal claim upon Shaw, an arrangement was made finally consummated with third parties under which not only Shaw was secured, but the plaintiffs" also were benefited, and that they accepted such benefit.
Now the terms imposed by Shaw on this final settlement may have been harsh, but again the plaintiffs had legal advice; the papers were prepared and executed and the arrangement completed with knowledge of every fact involved, and the plaintiffs were satisfied with the arrangement.
*18 Upon the whole case I fail to perceive that Shaw did any thing towards securing that to which he was honestly and fairly entitled, which in law or equity he had no right to do. I have read the evidence with care and am satisfied that the findings of fact, as made by the referee, are sufficiently sustained by evidence, and that they in turn sustain the conclusions drawn from them.
There being no error, and the exceptions to the exclusion of testimony being clearly untenable, the judgment should be affirmed with co'sts.
Sedgwick and Speir, JJ., concurred.